Welcome to the West Courtroom panel. I am honored to be sharing the week's cases with Judge Edith Jones from Houston and Judge Priscilla Owen from Austin. We have an interesting mix of cases for the week, and today is no different. As we used to say with electronics, we've read the record and are pretty adept on what's in here, so your arguments will help us to unravel some of the mysteries, but for the most part, if you'll help us out with understanding what transpired. The first case that we have up is United States v. Diaz. Ms. Orr? Good morning. My name is Cynthia Orr, and I represent Dr. Albert Diaz in this case. I'm going to begin by arguing contact with a represented person following by implicit jury bias, and if I have time, sufficiency of the evidence. Dr. Diaz was represented by a lawyer, Steven Peay, at Record 151. This lawyer responded to a subpoena of January 14, 2016, and the government was meeting and dealing with this lawyer. Also during a medical board investigation interview with Dr. Diaz, he asserted his right to counsel and advised the medical board agent that his lawyer wished him to invoke his right to counsel. Is that a federal medical board or a state? State. But the medical board representative served a federal grand jury subpoena on Dr. Diaz at that time. By September 13, 2016, we can tell from the reports in the record that Dr. Diaz had been recorded on September 28, sometime after at Record 4914, the report says agents pitched the possibility of Schar, a cooperator co-defendant, participating in consensually monitoring and recording face-to-face and telephonic conversations with some of the targets of this investigation. And one of the targets that they said that they discussed was Dr. Diaz. And so this is in a written report at 4918 of the record. As this court knows, a target is a person who has been designated as a defendant. This is someone that the U.S. Attorney's Manual indicates against whom the grand jury has subpoenaed. Exactly. I mean, noting how much overall time you have. So exactly where are you headed with this? Well, I think that what I'm saying is at this point, the Sixth Amendment right to counsel attached. Regardless of the fact Dr. Diaz was not yet indicted, it was determined he was a defendant and matters had changed from investigatory to accusatory. And it's during this time, Your Honor, that the government recorded interviews with Dr. Diaz and his co-defendant Schar on two occasions. This was purposeful, as we can see from the reports and the discussion by counsel. What's your best case that says this was improper? Pardon me, Your Honor? What is your best case that says this is improper? Well, I think Escobedo and then some of the more recent cases where Justice Alito is talking about the right attaching before formal charges. And it's in my brief, and I can get you that citation after argument. But it's a more current Supreme Court case. It's not a question of when the right to counsel attaches. What's your best case that says when a defendant talks to a co-defendant, that's out of bounds, if one of the defendants is represented? Ordinarily, it wouldn't be. But here, Schar was already working as an agent for the government. So he was the equivalent of a government agent. Again, what's your best case that says this is improper? I think that with regard to that, my best case would be U.S. v. Danielson out of the Ninth Circuit and then Hines out of the Fifth Circuit in 1993. In that case, it came out against me. But there, the government was investigating a future crime, not the current crime. But it's pretty clear there and under Barlow that once the Sixth Amendment right attached, one becomes the accused and the government needs to discontinue communicating with the defendant. So I guess the best case, I gave you three, Your Honor. I think Barlow would be my best, 41 Fed Third, 935 out of the Fifth Circuit. So you're not arguing at this point, or are you, that he was interfering, that Schar's conversation interfered with the attorney-client relationship? You're going beyond that? I'm going beyond that. I'm saying that the intrusion was purposeful, evidence was offered by the intrusion, and that the prosecution obtained details about Dr. Diaz's defense strategy where he said, I'm going to tell you the truth to the investigators when they come, but I'm not going to volunteer information. Schar says, what's your attorney saying? Nothing. But they've got to ask me a question. I'm not going to tell them anything. Your Honor, this was used to indicate Diaz was stonewalling and sort of making up a story, but when in fact what he was relaying is his lawyer's advice to him, to Mr. Schar. Is that what every defense attorney tells his client? Hopefully, Your Honor. And then you contacted me, you kept telling me about Randy, said Dr. Diaz. I don't remember Randy. Randy's important because he was the owner of the pharmacy that was selling this compound medicine that created such high bills for TRICARE. And Schar says, I know you don't know him. And then he kept feeding him information. He sent me the stuff for you to put in the charts. Do you still have the stuff with his handwriting? There's the one on the chart that he sent with the patient information at $29.89. I don't know Randy. The only people that were present when I went after I gave the prescriptions and saw the patients, some of them had their spouses there. And Schar pushes again, but the patients know Randy. And if these people talk to the patients, Dr. Diaz, I know Randy. I know they know Randy. I don't know Randy. I've never met him, never talked to him. Well, he's the guy that brought us him around. Well, believe it or not, I didn't know that until you just told me. And so this exchange was colored with, instead of Schar providing Diaz information he didn't know, as Diaz sort of stonewalling and saying, well, you're my reference, not Randy. And it was used, in fact, literally to say that Dr. Diaz was, as I said, stonewalling and trying to be willfully blind, so to speak, to the offense conduct. The intrusion for the fourth point was also used in other ways, Judge Jones. It was used to indicate Randy had sent Dr. Diaz these patients, not the rep who had told him the VA had been prescribing the meds they could no longer get and they would have to go on this more addictive medication that Dr. Diaz wanted to help them avoid, that they needed a doctor to replace folks who had previously been prescribing this medication and Dr. Diaz was it, and to feed him information about the cause. Dr. Diaz had no idea and no concern about expenses. He charged patients, nothing for them. He submitted not a single claim. He made not a single dime. This case is extraordinary in that regard. And he asked on these recordings, Schar, how much were they charging? Schar, I have no idea, but it must have been a lot. To which Diaz replied, you cannot abuse the government. And this was turned on its head and used against Dr. Diaz as if somehow he was aware that something was awry. Well, there were over 200 prescriptions, right? There were, but, Your Honor, if you look at those prescriptions, you can see most of those are cut and paste. You can actually see the whiteout where people are writing in information, and Schar said he got old prescriptions and recycled them. That's in the record and in his testimony. And so what we have here is Diaz was prescribing a few people that Schar brought to him, that he presented the scenario about these poor vets, like Dr. Diaz was a poor fire serviceman that needed this help, and that Schar said, I went in, I got some of his employees to stamp these prescriptions for me, wouldn't identify who those employees were. And so very few prescriptions did Dr. Diaz actually sign for this. There were some. There were. At least five or six, maybe seven, Your Honor. He admits over a two-year period as he was making these prescriptions, he didn't see a single patient. Absolutely correct, Dr. O. Why isn't that true? Not until he got the audit letter from TRICARE. That's some evidence that he was doing something illegal. No. And I'm glad you brought that up because it is not against the law not to see a patient before you prescribe them drugs. For example, Dr. Thomas, who testified for the government, said calling a prescription for someone you have not seen is sort of a general state medical board violation, but it's not a violation of criminal law, 1742. In addition, physicians testified that oftentimes, and this was testimony enlisted by the government, I think it was Ms. Yeager, that oftentimes a patient will call a partner to a physician, it's not their patient, and they know another physician has prescribed the medication and so they'll renew it for them or emergency situations. His medical practice was in what area? Sorry? His medical practice was principally in what area? He principally was an OB-GYN. He previously worked at the Appalachia Hospital and volunteered at the VA Hospital, Your Honor. These are prescriptions at issue here. These were not prescriptions that in his typical OB-GYN practice he had prescribed in the past. Is that correct? That's correct. I'll accept that. He had used ketamine in his OB-GYN practice before, not as a cream but in another application with regard to anesthesia. That's right. But he did have male patients also. All these prescriptions at issue, though, they're kind of in a whole new frontier of writing prescriptions for medications in an area where otherwise in his OB-GYN practice he had not. Correct, Judge Stewart. But what is different here is it was de minimis. So we're talking a low number of prescriptions. And the testimony was that in the pharmacy within the building where his office was, this prescription cost maybe $50, $60. So it was a small favor to do for a medical rep. It seemed something small to avoid. Vets who had been previously prescribed this medicine that was working, that had efficacy, to help them avoid having to take medications like Percocet and Lortab that were opioids. And so it was a de minimis, you know, altruistic thing that was within Dr. Diaz's normal character and practice. The next point I'd like to discuss is jury bias and implied bias. Here we have the extraordinary circumstance where just before the case was going to go to the jury and the jury was to be charged, the court called everyone in and said the marshal this morning told me that one of the jurors came and said she'd been threatened by the family of the defendant. The court noted how extraordinary this was at 681. I've never had anything like this come up. And John Coletti, who's present and tried the case, immediately moved for a mistrial at 2562. The Brooks case tells us what we do when we look at implied bias of a jury is we look at all the facts and circumstances, and we do not listen to really sincere held beliefs of jurors, assurances that they could be fair. We know from Andrews v. Collison's that we look and we find implied bias where the situation that was created creates substantial emotional involvement of the jurors. This juror who came forward, Hedring Vardier, indicated that if things went past Wednesday in this trial, that she'd have some trouble with her tax business at 1374. But she was accepted as a juror. And then when first interviewed by the judge, she said, well, I was uncomfortable. And the judge says, I have two concerns, that you felt uncomfortable. And my other concern is that you talked to the other jurors and may have prejudiced them in the way that they would vote one way or the other at 2551. And she says, no, it's basically what I let them know. I was uncomfortable. However, all but one of the other jurors became substantially emotionally involved. The one who sort of came late and wasn't interacting with everyone else was R. Powell at 2588. In fact, the juror had told them she had been intimidated by the defendant and his family by following her in a stairwell and speaking to her at 2641 through 42. She was visibly upset and crying in the bathroom for a full five minutes at 2597 to 98. Eight of the jurors told her, you need to tell someone about this. You need to tell the judge. You need to tell the bailiff. You need to report this. Many accompanied her to lunch to make sure she felt safe at 2627 as she left court at 2583 and back into court in the morning at 2588 to make her feel safe. One of the jurors, she told, I changed cars from yesterday to today so that they couldn't follow me. And, well, I didn't get bombed, you know. Well, my car didn't get bombed, she told the juror at 2661, Juror Williamson. Jurors reported she kept going on and on about it throughout Wednesday and Thursday at 2558, 2586, and 2534. And one juror said it may have been an honest mistake, agreeing that somehow the defendant had spoken to her at 2623. All right, thank you, Ms. Zoll. You have reserved your rebuttal time. Thank you, Judge Stewart. Thank you. All right, let's hear from the judge. May it please the Court, Anne O'Connell Adams on behalf of the United States. Dr. Diaz signed prescriptions for medically unnecessary compound medications, some of which contained a controlled substance, for two years without seeing a single patient. Through that scheme, Dr. Diaz and his co-conspirators caused Tricare, a federal health care benefit program, to part with millions of dollars to cover the unnecessary medications. And when government investigators contacted him to see what was going on, he falsified patient records, backdated them, in some cases even made up vital signs for patients that he never met. The evidence is far more than sufficient to sustain all of the convictions that the jury returned. I'll start with the issue of the recordings. Counsel for Mr. Diaz is focused on the Sixth Amendment here today. The Sixth Amendment right to counsel does not attach until the initiation of formal charges or adversary judicial proceedings. That is a decades-old doctrine of the Supreme Court, Moran v. Burbine, and many other cases. It's based on the text of the Sixth Amendment, which says, in all criminal prosecutions, the accused shall have the assistance of counsel for his defense. I thought it attached at arraignment. We got reversed on that. I remember the case. Excuse me? I thought it attached at arraignment. I remember getting reversed. Judge King and I got reversed on that. Right. That's as soon as adversary judicial proceedings. Which is arraignment. Yes, it can be. It certainly does not attach when somebody becomes the target of a grand jury investigation. In those cases, the case is still in an investigatory phase. There is no Sixth Amendment right to counsel. I'm not aware of any case saying that it is. Escobedo is a pre-Miranda case that addresses the Sixth Amendment and uses Sixth Amendment analysis to address somebody's right to counsel during custodial interrogation. It's been superseded by Miranda. There's a whole different way of analyzing those custodial interrogations now. The key point is that the Sixth Amendment right to counsel, which is what counsel's argument is based on today, does not attach until the initiation of adversary proceedings. Professional rule of conduct 4.2 in Mississippi that applies to federal prosecutors under 28 U.S.C. 530B. The position of the professional responsibility office for the Department of Justice is that covert pre-recording investigative communications by undercover agents or cooperators fall within the exception that the communications are authorized by law, which is in the— The ordinary process, once the government sends the target letter to the target, I mean, it kind of says that. It's a scary proposition, so although, as you just said, assuming what you said to be true, that Sixth Amendment doesn't attach just because one is a target. But as a practical matter, once that person gets a target letter, it usually ends up with them fairly quickly engaging counsel or whatever, so the process may trigger. So on the facts here, when the target letter was sent out to him, there was no early engagement of counsel, not because of the target letter. You follow me? So in the sequence of events, despite the fact he got a target letter, I take it he did not engage counsel immediately such that it affects the argument you're making. Well, whether he engaged counsel or not doesn't affect my argument. Even if a person is represented by counsel, it's our position, and this Court has held, that that doesn't implicate the professional conduct rule 4.2, that the government can send undercover agents and cooperators in to communicate with such a person, even if we know that the person is represented by counsel. Under the ethics rules, the government should not do that if it's come to some kind of an agreement or represented to the counsel on the other side, that it would not do so without notifying counsel. But there's no allegation that that kind of agreement was reached in this case, and it was not. The attorney-client privilege portion of this is connected to the ethics rules. So when a person is sent in to a cooperator or an undercover agent to talk to somebody who's represented, there's a separate ethics rule 4.4 that says you have to be careful not to violate the legal rights of a person during such an interview. Cooperators are regularly warned that they should not ask about attorney-client communications during such conversations. And in this case, the two things that, you know, could arguably read to implicate the attorney-client privilege, the first one was in the September 26th meeting when Schar says, did you talk to your attorney? But it was not, he was not trying to get to what the communications were between Diaz and his attorney. He was asking it in the sense of, do you know what's happening? Are we going to be interviewed? That type of thing. In the other meeting in January 2017, the language that the defenses focused in on is, did you tell your attorney about Tomley? And when the district court analyzed this, what it said was that was clearly meant to elicit an admission from Diaz on the tape that he did know Randy Tomley, which he did, and which he was telling Schar in that conversation he was not going to admit that he knew him and not going to say that to investigators. Even if those statements or those questions could be read to implicate or intrude on the attorney-client privilege, Dr. Diaz didn't disclose any privileged information in response, so there's nothing to be done here. The relief that the defense was seeking with this argument was suppression of evidence. The United States v. Hines, a case from this court, said that if there are violations of these ethics rules, suppression is not a remedy that is warranted, nor would a new trial be warranted or dismissal of an indictment or anything like that. If there's violation of ethics rules, which, again, there were not here, the remedy would be some sort of disciplinary sanctions against the people that violated the ethics rules, but certainly not suppression of evidence. If I could move to the juror bias issue. This court has outlined several unusual situations where a finding of implied juror bias would be warranted. Those are things like a juror is employed by the prosecutor, a juror is a close relative of a trial participant, a juror is a witness to the crime, things like that. There are situations where there's an inherent perceived stake in the outcome of the case. That was also the case in the Brooks v. Dretke case that the defense relies upon, where a juror was arrested for bringing a gun into the courthouse during the sentencing phase of a capital murder trial. The idea there was that now this person will be a criminal defendant prosecuted by the same people that he is sitting in judgment of, and so a person in those circumstances would be likely to vote in favor of the prosecution to garner favor. The circumstances here do not present the same type of inherent stake in the outcome of the case that are present in those scenarios. The jurors did walk juror number one to her car and eat lunch with her. The judge concluded after a very thorough investigation into the juror that was crying that it wasn't because they thought she was in any danger, but simply to be nice to her. The other jurors clearly didn't take her seriously, and I think it all came to fruition when a few of them were waiting for her downstairs at the courthouse and she blew past them and mashed the elevator button, went upstairs and said, it happened again, they were waiting for me again, and they said, no, that was us, which embarrassed her and caused her to start crying. When the jurors were interviewed about it, uniformly they said, we think she was just overreacting or maybe she was a little bit paranoid, but there's no way that this would affect my ability to view this case. It was all kind of just a sideshow. And the district court's careful consideration and way that he moved forward, including having each juror come in and give a statement about what happened and then doing it all again under oath at the defense's request, ensured that Dr. Diaz had a fair trial not in front of a biased jury. Well, let me, this is not, no issue was raised about this on appeal, but I was wondering in light of the somewhat modest sentence of the court, how did he arrive at over $3 million in restitution? The $3 million restitution amount was based on the amount of money that TRICARE lost. But, again, I think the main point on restitution is that no notice of appeal was filed on the amended judgment with the restitution order, and so that issue is not properly before this court. I understand that. So is he jointly and severally liable with Char on the restitution? I believe that's the idea because it is for the full amount that TRICARE lost. And did any of the patients appear at trial? Yes. Several of them appeared at trial to indicate that. Some of them were told that this was an experimental drug, that they could receive payments in order to try it, which is why the medications kept appearing without people complaining about it. But several of them, I think four in total, appeared at trial to indicate that they never met Dr. Diaz before this medicine started coming, that in some instances he came to Hattiesburg to try to meet with them and create patient records afterward. They were all shown the patient records that were created. One of them, Leanne Hardwick, hid in her bedroom while Dr. Diaz was in the house talking to her husband, yet her patient record came back with vital signs, blood pressure, those types of things that were just fabricated. And Dr. Diaz testified, correct? That's correct. His defense essentially, other than he was the only witness for the defense, is that correct? There were quite a few witnesses put on by the defense. But on the seminal charges, I mean, he took the stand, both with respect to the statements as well as his culpability. Okay. On the sentence, again, he got, what, three years, four years? I guess, where is he now? I mean, in terms of time, he's done in about half of it, 12 months. I'm not exactly sure. The judgment was entered June 18th. He was denied release pending appeal, right? So he's been in prison at least since around June of last year, I would assume. I would say 70-something. 78, 80? I'm not exactly sure his age. I think he's 80. Your name is not on the briefs. It's not. I believe the attorney who wrote the brief is on vacation this week, asked for the argument to be rescheduled, so I was reassigned to it instead and have learned about the case myself. A couple of additional points. One, I'd just like to talk about the stamp for a moment. Defense counsel indicates Dr. Diaz only signed a couple of these prescriptions, and that was one of the main things that the defense tried to put on at trial, that these prescriptions were somehow altered in some way or that Mr. Scharr perhaps created a stamp and was stamping Dr. Diaz's name on the prescriptions. Scharr testified to the contrary at trial, and the jury was entitled to believe him. The standard for this court to uphold the verdicts is that if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, then the court must affirm. The stamp was also used on nonadvantaged prescriptions. That was brought out at trial at the record in 2173 and 2174. In response to the subpoena, the subpoena said, can you give us all the prescriptions you wrote for compound medications? And Dr. Diaz produced not only the advantaged prescriptions but some other ones too that had nothing to do with advantage or Jay Scharr, and it came out at trial that some of those were also stamped with that same signature stamp that appeared on some of the advantaged prescriptions. And so it's not the case that, you know, Dr. Diaz did testify at trial that I don't think I signed these, the signature stamp must have been used, but Jay Scharr testified that he never asked anybody to use the signature stamp unless Dr. Diaz had already specifically approved those medications. Also, one other quick point, the story that Dr. Diaz was telling and that was being concocted on one of the recorded conversations that these patients were given to him by the VA, these were people that were being treated at the VA and now they could no longer receive the medications and that this was an altruistic way to help out veterans. You can hear that story being created on one of the recordings, but also the people that were covered by TRICARE were not presented to Dr. Diaz until October of 2014. In March and July of 2014, Dr. Diaz was already signing prescriptions for there's testimony about a guy from the Verizon store that was a friend of Jay Scharr. These were not initially presented to him as people that were covered by TRICARE and connected to the military. Unless the Court has further questions. I think we've got it. We can ask you to affirm. Thank you. Thank you. All right. Back to you, Ms. Orr. Thank you. I wanted to indicate first that since we mentioned Mr. Scharr testifying against Dr. Diaz, he also testified that I haven't personally accused Dr. Diaz of anything at Record 1933 and he also testified he enlisted the aid of persons who he would not name in Dr. Diaz's office to stamp prescriptions and a review of the exhibits. You can really see that they're altered. Patient information whited out and other written over, but imperfectly whited out. In addition, with regard to the recordings, you can see, and if you look at G1 and G2, where after asking what does your lawyer say, Scharr grabs Dr. Diaz's phone and actually reads texts to Dr. Diaz from his lawyer in which he obtained Dr. Diaz's strategy from his lawyer, and then that was used out of the recordings to indicate Dr. Diaz was stonewalling and constructing stories when, in fact, he was resisting Scharr trying to feed him information. I don't know Randy. Yes, he's the one who supplied you the patients. Well, I know you don't know Randy, but he's the one and so on. With regard to the patients who testified, M. Hardwick testified, I'm sorry, her mother testified that she had had teeth pulled, that she had had a previous doctor, Brandley Nicholas, prescriber of the medication at 1779, and that this was a follow-up on that pain cream, that her husband worked for the insurance companies who would pay for the medicine and arranged for herself and her daughter to get the prescriptions at 1763, and that when Dr. Diaz did come examine the Hardwicks, that James Hardwick, the husband, provided the vital signs and information in the charts and gave the patient information on his daughter and wife at 1803. So it wasn't wholly concocted information. It was supplied by family members. In count seven and eight, the mother and the daughter. In count nine, it was Samuel C., who had trouble with his back. His wife got the prescription for him. Her son was Randy, the Randy who owned the pharmacy. That's at 1786. He also had scars from skin cancer at 1786, and he indicated that the medicine had helped him, although he complained to his wife he was receiving quite a bit of it. And the doctor came and examined him as well and took his medical information correctly, and he even relayed a story that they had discussed a plane that he had for sale. That is the patient. In count ten, John M., he received the cream because his dad was getting the creams for him at 1757. He confirmed, yes, I used the pain cream for my pain at 1747. That Brantley Nicholas, a doctor, first prescribed the cream for him as had been represented to Dr. Diaz, and he did have knee and headaches like the record said at 1752. So the patients that testified confirmed Dr. Diaz sought them. They really had these medical complaints. Yes, they did use the creams, and when the doctor got patient information about them, they got them from family members. The doctor I couldn't recall and direct my first opening was Dr. Cooper. The government elicited testimony that physicians write scripts for patients they don't see at 2370 and gave that partner example. In addition, the government elicited testimony asking the defense witness to agree that so long as there's some interaction with a patient, whether directly or indirectly, this chart information was appropriately obtained at 2352. What about falsifying charts? There were none falsified, Judge Owen. I thought there was testimony that the woman refused to see him. She hid in the bathroom or bedroom. It was Ms. Hardwick. Your Honor, Ms. Hardwick did go into her bedroom. She reported vital signs that he didn't take. Ms. Hardwick was the one, and Mr. Hardwick was unusual in that he recorded his own vital signs. It was the family that kept track of their own vital signs, and he testified that he provided Dr. Diaz that patient information for his wife at record 1803. So, yes, Leanne did not give it directly, Your Honor. That's the point I was making is proper to get it from family members as well. Otherwise, you know, infants or people in distress couldn't receive medical care. Did she testify she was afraid of him and did not? She said she was just uncomfortable. She didn't say she was afraid. Dr. Thomas, who testified for the government, indicated that calling in a prescription for someone is a general state board violation but not a federal criminal law violation at 1742, and I see I'm out of time. All right. Thank you, Ms. Owen. Thank you. Thank you, Your Honor. We've honed in on a couple of arguments. Didn't try to argue the whole case, so we've got your arguments. And thanks to both counsel for helping us out. All right. The case will be submitted. We call the next case.